IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-111-ELG |
| | ) | (Chapter 11) |
| COREY BARNETTE | ) | |
| | ) | |
| Debtor. | ) | |

**OPPOSITION TO U.S. TRUSTEE'S**
**MOTION TO DISMISS CHAPTER 11 CASE**

Maurice B. VerStandig, Esq.
Bar No. MD18071
The Belmont Firm
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
*Counsel for Corey Barnette*

# TABLE OF CONTENTS

I.      Introduction ................................................................................................................ 1

II.     Relevant Facts .......................................................................................................... 2

III.    Argument: The Licensed Cultivation of Medical Marijuana in the District of
        Columbia Does Not Offend Federal Law ............................................................ 2

IV.     Argument: Department of Justice Policy and Precedent Precludes
        Consideration of the Portions of the Controlled Substance Act Otherwise
        Applicable to the Licensed Cultivation of Marijuana in Jurisdictions with Local
        Regulatory Schemes Permitting Licensed Cannabis Cultivation ................................... 13

V.      Argument: Bankruptcy Courts are not Precluded from Administering
        Marijuana-Centric Cases in Jurisdictions where Federal Anti-Marijuana Laws
        are Not Enforced ........................................................................................................ 19

VI.     Argument: The Debtor has Not Grossly Mismanaged the Estate ................................... 24

VII.    Argument: Insurance and Reporting Issues Do Not Weigh in Favor of Dismissal ......... 26

VIII.   Conclusion .................................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
995 F.2d 1106 (D.C. Cir. 1993) ................................................................. 9

*American Postal Workers Union v. U.S. Postal Service*,
707 F.2d 548 (D.C. Cir. 1983) ................................................................. 9

*Ashwander v. Tennessee Valley Auth.*,
297 U.S. 288 (1936) ................................................................. 13

*Ass'n of Am. R.Rs. v. United States DOT*,
896 F.3d 539 (D.C. Cir. 2018) ................................................................. 13

*Berman v. Parker*,
348 U.S. 26 (1954) ................................................................. 3

*Blumsack v. Harrington*,
657 B.R. 505 (B.A.P. 1st Cir. 2024) ................................................................. 22

*Brewer v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*,
953 F. Supp. 406, 410 (D.D.C. 1997) ................................................................. 4

*Broadgate Inc. v. United States Citizenship & Immigration Servs.*,
730 F. Supp. 2d 240 (D.D.C. 2010) ................................................................. 9

*Burton v. Maney (In re Burton)*,
610 B.R. 633 (B.A.P. 9th Cir. 2020) ................................................................. 23

*C. I. O.  v. McAdory*,
325 U.S. 472 (1945) ................................................................. 14

*Capital Traction Co. v. Hof*,
174 U.S. 1 (1899) ................................................................. 3, 4

*Cent. Bank of Mattoon v. United States Dep't. of Treasury*,
912 F.2d 897 (7th Cir. 1990) ................................................................. 15

*Cohens v. Virginia*,
19 U.S. (6 Wheat.) 264 (1821) ................................................................. 5

iii

*Cook County National Bank v. United States*,
107 U.S. 445 (1882) .................................................................................................... 6

*Dist. Props. Assocs. v. District of Columbia*,
743 F.2d 21 (1984) ................................................................................................... 6, 7

*District of Columbia v. John R. Thompson Co.*,
346 U.S. 100 (1953) ............................................................................................... 3, 10

*Dubuque v. Iowa*,
53 U.S. (12 How.) 1 (1851) ....................................................................................... 10

*El Paso & N. R. Co. v. Gutierrez*,
215 U.S. 87 (1909) ........................................................................................................ 4

*Ex parte La Prade*,
289 U.S. 444 (1933) .................................................................................................... 14

*Flast v. Cohen*,
392 U.S. 83 (1968) ...................................................................................................... 13

*Golden v. Zwickler*,
394 U.S. 103 (1969) .................................................................................................... 13

*Griswold v. Connecticut*,
381 U.S. 479 (1965) .................................................................................................... 14

*Gundy v. United States*,
588 U.S. 128 (2019) .................................................................................................... 12

*In re Callaway*,
2024 Bankr. LEXIS 1515 (Bankr. N.D. Cal. June 26, 2024) ................................. 20, 22

*In re Franmar, Inc.*,
361 B.R. 170 (Bankr. D. Colo. 2006) .......................................................................... 26

*In re Hacienda Co.*,
647 B.R. 748 (Bankr. C.D. Cal. 2023) .................................................................... 22, 23

*In re King*,
200 So. 3d 495 (Ala. 2016) ........................................................................................... 5

*IRS v. D.C. (In re WPG, Inc.)*,
282 B.R. 66 (D.D.C. 2002) .................................................................................... passim

*J. W. Hampton, Jr., & Co. v. United States*,
276 U. S. 394 (1928) .................................................................................................. 12

*Jensen v. Md. Cannabis Admin.*,
2024 U.S. Dist. LEXIS 33001 (D. Md. Feb. 27, 2024) ............................................. 18

*Keller v. Potomac Elec. Power Co.*,
261 U.S. 428 (1923) ..................................................................................................... 3

*Kendall v. United States*,
37 U.S. 524 (1838) ........................................................................................................ 4

*Kiviti v. Bhatt*,
80 F.4th 520 (4th Cir. 2023) ...................................................................................... 13

*Late Corp. of Church of Jesus Christ v. United States*,
136 U.S. 1 (1890) .......................................................................................................... 4

*Legal Ethics v. Printz*,
416 S.E.2d 720 (W. Va. 1992) .................................................................................... 15

*Lucy Webb Hayes Nat'l Training Sch. etc. v. Perotti*,
419 F.2d 704 (D.C. Cir. 1969) ................................................................................... 15

*Marijuana Policy Project v. United States*,
304 F.3d 82 (D.C. Cir. 2002) ................................................................................. 9, 11

*Martin v. Santorini Capital, LLC*,
236 A.3d 386 (D.C. 2020) .......................................................................................... 24

*Mellon v. Michigan Trust Co.*,
271 U.S. 236 (1926) ...................................................................................................... 6

*Mistretta v. United States*,
488 U.S. 361 (1989) .................................................................................................... 12

*Myerson v. United States*,
98 A.3d 192 (D.C. 2014) ............................................................................................... 8

v

*N. Pac. Ry. v. Barnes,*
51 N.W. 386 (N.D. 1892) ................................................................................................. 9, 10

*National Latino Media Coalition v. FCC,*
816 F.2d 785 (D.C. Cir. 1987) ............................................................................................. 9

*Nat'l Bank v. Cty. of Yankton,*
101 U.S. 129 (1879) ...................................................................................................... 4, 10

*Navegar, Inc. v. United States,*
103 F.3d 994 (D.C. Cir. 1997) ........................................................................................... 17

*Nebbia v. New York,*
291 U.S. 502 (1934) ............................................................................................................ 4

*Neild v. District of Columbia,*
110 F.2d 246 (D.C. Cir. 1940) ......................................................................................... 4, 8

*New York v. Miln,*
36 U.S. 102 (1837) .............................................................................................................. 4

*O'Donoghue v. United States,*
289 U.S. 516 (1933) ........................................................................................................ 3, 5

*Plaut v. Spendthrift Farm, Inc.,*
514 U.S. 211 (1995) .......................................................................................................... 13

*Poe v. Ullman,*
367 U.S. 497 (1961) ..................................................................................................... 14, 19

*Pollard v. Hagan,*
44 U.S. (3 How.) 212 (1845) .............................................................................................. 4

*Public Serv. Elec. & Gas Co. v. FERC,*
783 F.3d 1270 (D.C. Cir. 2015) ......................................................................................... 13

*Qassim v. Trump,*
927 F.3d 522 (D.C. Cir. 2019) ........................................................................................... 13

*Seegars v. Ashcroft,*
396 F.3d 1248 (D.C. Cir. 2005) ......................................................................................... 17

*Shoemaker v. United States*,
147 U.S. 282 (1893) ............................................................................................................. 4

*Sibley v. Obama*,
819 F. Supp. 2d 45 (D.D.C. 2011) ..................................................................................... 17

*Sims v. Rives*,
84 F.2d 871 (D.C. Cir. 1936) .............................................................................................. 4

*State ex rel. Canterbury v. Blake*,
584 S.E.2d 512 (W. Va. 2003) ........................................................................................... 15

*Stoutenburgh v. Hennick*,
129 U.S. 141 (1889) ............................................................................................................. 4

*The Loan Ass'n v. Topeka*,
87 U.S. (20 Wall.) 655 (1874) ............................................................................................ 4

*United States v. Bilodeau*,
24 F.4th 705 (1st Cir. 2022) ............................................................................................... 18

*United States v. Greene*,
489 F.2d 1145 (D.C. Cir. 1973) .......................................................................................... 4

*United States v. Guaranty Trust Co.*,
280 U.S. 478 (1930) ............................................................................................................. 6

*United States v. Jones*,
347 F. Supp. 2d 626 (E.D. Wis. 2004) ............................................................................... 15

*United States v. Kirkland*,
405 F. Supp. 1024 (E.D. Tenn. 1975) .............................................................................. 9, 10

*United States v. McIntosh*,
833 F.3d 1163 (9th Cir. 2016) ........................................................................................... 18

*United States v. Saidman*,
231 F.2d 503 (D.C. Cir. 1956) .......................................................................................... 6, 8

*Wash. Loan & Tr. Co. v. Allman*,
70 F.2d 282 (D.C. Cir. 1934) ............................................................................................. 4

**Statutes**

11 U.S.C. § 541 ........................................................................................................... 25

11 U.S.C. § 1112 ............................................................................................. 23, 24, 26

11 U.S.C. § 1208 ........................................................................................................ 26

21 U.S.C. § 801 ............................................................................................................. 1

21 U.S.C. § 812 ............................................................................................................. 7

21 U.S.C. § 841 ............................................................................................................. 7

21 U.S.C. § 854 ........................................................................................................... 20

28 U.S.C. § 151 ........................................................................................................... 17

D.C. Code § 1-201.02 ................................................................................................... 8

D.C. Code § 1-206.01 ............................................................................................... 8, 9

D.C. Code § 1-206.02 ................................................................................................... 9

D.C. Code § 7-1671.06 ................................................................................................. 7

D.C. Code § 29-801.04 .............................................................................................. 24

D.C. Code § 47-2012 ................................................................................................... 5

Pub. L. No. 1-28, 1 Stat. 130 ....................................................................................... 3

Pub. L. No. 93-198, 87 Stat. 774 ................................................................................. 8

Pub. L. No. 107-96, 115 Stat. 923 ............................................................................. 11

Pub. L. No. 114-113; 129 Stat. 2242 ......................................................................... 18

**Other Authorities**

*Attorney general nominee Garland signals friendlier marijuana stance*, MSBizDaily, Feb. 22, 2021, at https://mjbizdaily.com/attorney-general-nominee-merrick-garland-signals-friendlier-marijuana-stance/ (last visited July 20, 2024) ........................................................................... 18

*Confirmation Hearing on the Nomination of Hon. William Pelham Barr to be Attorney General of the United States Before the S. Comm on the Judiciary*, 116th Cong. 65 (2019) ................ 18

James M. Cole, *Memorandum for All United States Attorneys* (Aug. 29, 2013) .................... 17, 19

Medical Cannabis Retailer Locations, https://abca.dc.gov/page/medical-cannabis-retailer-locations#gsc.tab=0 (last visited July 20, 2024) ........................................................................ 16

*Publius*, The Federalist No. 33 (Jan. 3, 1788) .............................................................................. 5

Weed Maps, https://weedmaps.com/ (last visited July 21, 2024) ................................................. 16

**Rules**

Local Rule 9013-1 .......................................................................................................................... 1

**Constitutional Provisions**

U.S. Const. art. I, § 8 ..................................................................................................................... 3

U.S. Const. art. 1, § 8, cl. 17 ............................................................................................... 4, 10, 12

U.S. Const. art. 1, § 9, cl. 7 ........................................................................................................... 18

Comes now Corey Barnette ("Mr. Barnette" or the "Debtor"), by and through undersigned counsel, pursuant to Local Rule 9013-1(e), in opposition to the U.S. Trustee's Motion to Dismiss Chapter 11 Case (the "Motion," as found at DE #66, with the proponent thereof being known as the "U.S. Trustee"), and states as follows:

## I.    Introduction

This appears to be the first bankruptcy case involving an acknowledged participant in the marijuana trade, in the District of Columbia. The U.S. Trustee suggests, in the Motion, that dismissal is proper because (i) federal courts ought not countenance—much less work to facilitate the reorganization of—marijuana industry participants; (ii) Mr. Barnette has grossly mismanaged the estate; and (iii) the October 2024 monthly operating report is delinquent. The first issue is one upon which other courts have opined, with varying results, but never in the context of District of Columbia law. The second contention is fundamentally misplaced, as the U.S. Trustee seeks to conflate an individual and the business helmed by that individual. The October operating report has now been filed.

While the positions of the U.S. Trustee are certainly rooted in good faith and well-informed by a conscientious office charged with oversight of bankruptcy cases, the Motion merits denial for four reasons: (a) the District of Columbia's unique constitutional status creates a paradigm whereby local laws permitting the cultivation of medical marijuana are necessarily non-violative of broader federal laws governing the growth and sale of narcotic drugs; (b) the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, is inapplicable to this case, insofar as the statutory scheme relates to the cultivation and sale of marijuana in jurisdictions with putatively countervailing local laws, pursuant to the doctrine of desuetude or, alternatively, under precedent governing judicial restraint in the prism of unenforced laws; (c) even if the licensed cultivation of medical marijuana

1

is a technical violation of federal law, such does not deprive bankruptcy courts of the ability to administer marijuana-centric cases; and (d) Mr. Barnette has not run afoul of the more "ordinary" rules governing conduct in bankruptcy, saving and excepting his delinquent docketing of a report that has now been filed.

## II.    Relevant Facts

While there does not appear to be any factual dispute relevant to the Motion (excepting, perhaps, one concerning a minor issue surrounding life insurance), the Debtor openly stipulates to the following facts:

1.    Mr. Barnette holds a majority membership interest in—and is the chief proprietor of—District Growers, LLC ("District Growers"), an entity engaged in the cultivation of marijuana.

2.    District Growers holds a license, from the District of Columbia, to cultivate medical marijuana and is solely engaged in the cultivation of medical marijuana.

3.    District Growers conducts business exclusively in the District of Columbia.

## III.    Argument: The Licensed Cultivation of Medical Marijuana in the District of Columbia Does Not Offend Federal Law

The intersection of Constitution Avenue and Third Street, separating this Honorable Court from the United States Capitol, is littered with traffic at seemingly all hours of day and night. On the rear bumper of a plurality—if not outright majority—of those cars may be found license plates with a familiar motto: "Taxation Without Representation." Such is because, inside the building cattycorner to the federal courthouse, none of the 100 senators represent the District of Columbia, while the one local delegate to the United States House of Representatives cannot vote on the passage of laws. This is not a geographic oversight comparable to the Treaty of Paris inadvertently shelving part of Minnesota within Canada; this is a point of design dating to the nation's founding. The District of Columbia is legally distinct from the fifty constituent states of the union in myriad

ways—including the manner in which the municipality is governed. As a matter of constitutional law, District of Columbia law cannot conflict with federal law because District of Columbia law is exclusively a byproduct of federal law. Accordingly, when medical marijuana became legal in the four quadrants of the capital city, licensees operating under the relevant regulatory scheme found themselves necessarily acting in accord with—and not contrary to—the dictates of federal law.

While the Residence Act, Pub. L. No. 1-28, 1 Stat. 130, was not formally passed until July 16, 1790, the Constitution has, from the outset, openly envisioned the creation of a governmental seat to be legislated exclusively by Congress:

> The Congress shall have Power . . . To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings. . .

U.S. Const. art. I, § 8.

As explained by the Supreme Court, as far back as 1899, "[t]he Congress of the United States, being empowered by the Constitution 'to exercise exclusive legislation in all cases whatsoever' over the seat of the National Government, has the entire control over the District of Columbia for every purpose of government, national or local." *Capital Traction Co. v. Hof*, 174 U.S. 1, 5 (1899). *See also O'Donoghue v. United States*, 289 U.S. 516, 545 (1933) ("In dealing with the District, Congress possesses the powers which belong to it in respect of territory within a state, and also the powers of a state.") (citing *Keller v. Potomac Elec. Power Co*., 261 U.S. 428, 442-43 (1923)); *Berman v. Parker*, 348 U.S. 26, 31 (1954) ("The power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs.") (citing *District of Columbia v. John R. Thompson Co*., 346 U.S. 100 (1953)).

3

In more modern parlance: "Congress has exclusive authority to legislate in and for the District of Columbia." *Brewer v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 953 F. Supp. 406, 410 (D.D.C. 1997) (citing U.S. Const. art. 1, § 8, cl. 17). *See also United States v. Greene*, 489 F.2d 1145, 1153-54 (D.C. Cir. 1973) (discussing Congress' "exclusive constitutional authority to legislate for the District of Columbia").

Importantly, while Congress' legislative power over the District of Columbia is often analogized to that of state legislatures, the power is actually palpably more expansive, being rooted in the federal powers of the legislative branch and not the limited sovereignty of a state that is subject to the Supremacy Clause:

> Within the District of Columbia, there is no division of legislative powers such as exists between the federal and state governments. Instead there is a consolidation thereof, which includes [within] its breadth all proper powers of legislation. Subject only to those prohibitions of the Constitution which act directly or by implication upon the federal government, Congress possesses full and unlimited jurisdiction to provide for the general welfare of citizens within the District of Columbia by any and every act of legislation which it may deem conducive to that end. **In fact, when it legislates for the District, Congress acts as a legislature of national character**, exercising complete legislative control as contrasted with the limited power of a state legislature, on the one hand, and as contrasted with the limited sovereignty which Congress exercises within the boundaries of the states, on the other.

*Neild v. District of Columbia*, 110 F.2d 246, 250-51 (D.C. Cir. 1940) (citing *Kendall v. United States*, 37 U.S. 524 (1838); *Pollard v. Hagan*, 44 U.S. (3 How.) 212 (1845); *Wash. Loan & Tr. Co. v. Allman*, 70 F.2d 282 (D.C. Cir. 1934); *Stoutenburgh v. Hennick*, 129 U.S. 141, 147 (1889); *El Paso & N. R. Co. v. Gutierrez*, 215 U.S. 87, 93 (1909); *Downes v. Bidwell*, 182 U.S. 244, 268 (1901); *The Loan Ass'n v. Topeka*, 87 U.S. (20 Wall.) 655, 662-63 (1874); *Nat'l Bank v. Cty. of Yankton*, 101 U.S. 129, 130 (1879); *Late Corp. of Church of Jesus Christ v. United States*, 136 U.S. 1, 45 (1890); *Cap. Traction*, 174 U.S. at 5; *Sims v. Rives*, 84 F.2d 871, 872 (D.C. Cir. 1936); *Shoemaker v. United States*, 147 U.S. 282, 300 (1893); *New York v. Miln*, 36 U.S. 102 (1837); *Nebbia v. New York*, 291 U.S. 502, 523 (1934); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 429

4

(1821); *O'Donoghue*, 289 U.S. at 539) (emphasis added). *See also* Publius, *The Federalist No. 33*, p. 207 (Jan. 3, 1788) ("If a number of political societies enter into a larger political society, the laws which the latter may enact, pursuant to the powers intrusted to it by its constitution, must necessarily be supreme over those societies, and the individuals of whom they are composed.").[1]

The notion of Congress acting as a *national* legislature when tending to the affairs of the District of Columbia is not confined to a single circuit-level case from 1940. Rather, the doctrine has been echoed—in an opinion affirming a holding of this Honorable Court, no less—as recently as 2002: ". . . for congressional legislation concerning the District of Columbia, Congress maintains its national stature, and its enactments are not the equivalent of state actions." *IRS v. D.C. (In re WPG, Inc.)*, 282 B.R. 66, 69 (D.D.C. 2002).

*WPG* is ultimately instructive *sub judice*. There, a lien dispute arose between the District of Columbia and the Internal Revenue Service, in connection with a third party's bankruptcy proceeding. *Id.* at 67. The federal taxing agency had filed a lien in 1998, while the local government followed suit nearly a full year later, in 1999. *Id*. The dual-obligor thereafter sought bankruptcy protection and, following the payment of post-petition administrative obligations, the debtor's bankruptcy estate had $15,000.00 to be disbursed to one taxing party or the other. *Id.* The question was whether a "District of Columbia sales tax lien be accorded priority over an earlier filed federal tax lien." *Id.* at 68.

The Internal Revenue Service argued that this Honorable Court "erred in concluding that D.C. Code § 47-2012 is a federal law, entitling the District to first priority in collecting sales taxes owed. . ." *Id.* Noting that the subject local tax law had originally been enacted by Congress, the

---

[1] It is generally recognized that "Publius," in authoring this particular article, was Alexander Hamilton. *In re King*, 200 So. 3d 495, 587 (Ala. 2016).

United States District Court for the District of Columbia found the local tax law to "create[] an exception to the general federal priority followed in the federal lien doctrine in bankruptcy cases, allowing a D.C. Sales tax lien to take priority." *Id*. at 69 (citing *United States v. Saidman*, 231 F.2d 503, 509 (D.C. Cir. 1956)).

The reliance on *Saidman* is notable. There, the District of Columbia Circuit also explored a statutory tension between District of Columbia law and generic federal law, in the context of a lien priority dispute, with the appellate court finding that the particular fact pattern ". . . requires the inference that Congress intended to create an exception from the broad and general Federal priority in this one respect." *Saidman*, 231 F.2d at 509 (citing *Cook County National Bank v. United States*, 107 U.S. 445 (1882); *Mellon v. Michigan Trust Co.*, 271 U.S. 236 (1926); *United States v. Guaranty Trust Co.*, 280 U.S. 478 (1930)).

The U.S. Trustee relies on *Dist. Props. Assocs. v. District of Columbia*, 743 F.2d 21 (1984) for the proposition that the local laws of the District of Columbia are to be regarded no differently than the local laws of the fifty states. Motion, DE #66, at p. 4. Yet this argument misconstrues the markedly narrow and relatively unsurprising holding of *Dist. Props. Assocs*. There, a group of landlords challenged the almost-comically tenant-favorable nonfeasance of the District of Columbia Rental Accommodations Office (the "RAO"), alleging a violation of the civil rights protections enshrined in Section 1983 of Title 42 of the United States Code. *Dist. Props. Assocs.*, 743 F.2d at 26. The District of Columbia, in turn, argued that a local law allowing Section 1983 claims to be brought in local court meant, *ipso facto*, that Section 1983 claims could not also be brought in federal court. *Id.* at 27. The District of Columbia Circuit rejected this contention, finding that the District of Columbia Administrative Procedure Act ". . . is not a bar to appellants' attempt to bring this cause of action in federal court." *Id.* at 27.

6

The holding of *Dist. Props. Assocs.* is both mundane and consistent with what is urged *sub judice*. Yes, the District of Columbia Circuit therein observed that Congress' legislation of the District of Columbia should be regarded as local law; it necessarily follows that a statute tailored to the needs of the District of Columbia does not, upon passage, become indiscriminately applicable to Billings, Montana or even Yellowstone National Park. But *Dist. Props. Assocs.* does not address the doctrine set forth in *WPG* and *Saidman* (indeed, *Dist. Props. Assocs.* comes nearly two decades before *WPG*) where there is recognition of the local laws of the District of Columbia having the capacity to complement—and even substantively alter—the federal laws that otherwise bind the fifty states.

Here, the Controlled Substances Act expressly provides that "marihuana" shall be a Schedule I controlled substance "[u]nless specifically excepted or unless listed in another schedule." 21 U.S.C. § 812(c).[2] The same statutory scheme goes on to provide for the criminalization of the manufacturing, distribution, dispensing, and possession with intent to distribute, of controlled substances. 21 U.S.C. § 841(a). Yet the District of Columbia Code expressly allows for the cultivation of medical marijuana, provided the cultivator be licensed. D.C. Code § 7-1671.06.[3]

---

[2] It appears marijuana either has been, or is in the process of being, rescheduled. Mr. Barnette does not assert the specific schedule to which marijuana is affixed to be material to the disposition of the Motion; so long as marijuana is a scheduled drug, the U.S. Trustee has a good faith basis to bring the Motion and the merits of Mr. Barnette's various arguments will remain equally robust.

[3] The Motion makes fleeting reference to the District of Columbia having also decriminalized the possession of small quantities of marijuana. Motion, DE #66, at p. 5. For the avoidance of ambiguity, Mr. Barnette relies herein on his company's licensure to cultivate medical marijuana, under District of Columbia law. The question is not whether the possession of marijuana, by an unlicensed person (natural or legal), contravenes federal law; the question is whether express compliance with the District of Columbia's regulatory scheme contravenes federal law.

7

While the District of Columbia's medical marijuana laws are not premised on enactments passed by Congress prior to implementation of the District of Columbia Home Rule Act (the "Home Rule Act"), Pub. L. No. 93-198, 87 Stat. 774, the medical marijuana laws are nonetheless the byproduct of what appears to be a lawful delegation of Congress' exclusive constitutional power. To be sure, however, there exist only two possibilities in this context: (i) the medical marijuana laws have the same ability to trump other federal laws, as has been recognized by the *Neild*, *WPG*, and *Saidman* Courts; or (ii) the Home Rule Act is not an effective delegation of Congress' mandate to legislate for the District of Columbia and all laws passed thereunder are presumptively void.

In passing the Home Rule Act, Congress expressly indicated a statutory intent "to delegate certain legislative powers to the government of the District of Columbia; . . . and, to the greatest extent possible, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters." D.C. Code § 1-201.02.[4] The Home Rule Act is thusly properly understood as a delegation of Congress' plenary constitutional power. *See, e.g.*, *Myerson v. United States*, 98 A.3d 192, 197 (D.C. 2014) ("Under the Home Rule Act, Congress delegated broad power to the Council to enact local laws, subject to certain limitations.") (citing D.C. Code §§ 1-206.01-206.04).

This delegation of constitutional authority comes with certain express caveats, protections, and limitations, showing that Congress will continue to adhere to the Article I mandate of being the supervisory legislator of the District of Columbia:

---

[4] As noted *supra*, the Home Rule Act is cited, as a federal statute, as Pub. L. No. 93-198, 87 Stat. 774. The legislation was, however, codified as part of the District of Columbia Code. While somewhat odd, this is also a firm reminder of how District of Columbia law is, quite literally, federal law.

> Even with respect to rightful subjects of legislation, D.C. Council enactments become law only if Congress declines to pass a joint resolution of disapproval within thirty days (or sixty days in the case of criminal laws). Moreover, Congress expressly reserves the right to enact legislation concerning the District on any subject and to repeal D.C. Council enactments at any time.

*Marijuana Policy Project v. United States*, 304 F.3d 82, 83 (D.C. Cir. 2002) (citing D.C. Code § 1-206.02(c)(1)-(c)(2); D.C. Code § 1-206.01).

Yet, when Congress delegates legislative authority, the delegee becomes capable of exercising the subject legislative power. *Broadgate Inc. v. United States Citizenship & Immigration Servs.*, 730 F. Supp. 2d 240, 244 (D.D.C. 2010). When a delegee exercises the delegated powers of Congress, the resulting enactment has "the force of law," provided the delegee intended to exercise such delegated authority. *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (quoting *National Latino Media Coalition v. FCC*, 816 F.2d 785, 787-88 (D.C. Cir. 1987); *American Postal Workers Union v. U.S. Postal Service*, 707 F.2d 548, 558 (D.C. Cir. 1983)). *See also United States v. Kirkland*, 405 F. Supp. 1024, 1029 (E.D. Tenn. 1975) (noting that federal administrative agency regulations, "if reasonable and authorized, have the same effect as an Act of Congress."); *N. Pac. Ry. v. Barnes,* 51 N.W. 386, 397 (N.D. 1892) (". . .this power was delegated to the legislative department of the territory of Dakota at the time of its organization, and hence that body succeeded to and became possessed of all the powers of congress in respect of legislation in said territory. Nevertheless, congress could at any time withdraw this grant, or could legislate directly for the territory, and could annul any act passed by the territorial legislature. If congress did not choose to annul any act, then such act became valid

9

and binding, and was, to all intents and purposes, the act of congress itself.") (citing *Dubuque v. Iowa*, 53 U.S. (12 How.) 1, 4 (1851); *Yankton*, 101 U.S. at 129).[5]

The Home Rule Act is clearly one such delegation of Congressional authority. The plain text of the Constitution is clear—and case law is equally manifest—that Congress has the exclusive power to legislate for the District of Columbia. In passing that power to a local government, Congress both (i) exercised its limited right to delegate power; and (ii) exercised its ability to check and balance that delegation of power, as evidenced by the retention of veto power and the ability to repeal local laws. Where an action of the District of Columbia City Council is within the purview of the delegation of the Home Rule Act, and where Congress neither vetoes nor repeals the action, the ensuing law may be thusly understood to have "the same effect as an Act of Congress." *Kirkland*, 405 F. Supp. at 1029.

As such, the slight distinction between this case and *WPG* becomes moot. While some attention was paid, in *WPG*, to the subject law having been passed by Congress prior to enactment of the Home Rule Act, such is of no moment if the actions of the City Council, under the Home Rule Act, are to be regarded as the delegated actions of Congress itself. Since the Home Rule Act is merely a delegation of the Congressional power set forth in Article I, laws enacted thereunder are legally indistinct from acts of Congress itself.

---

[5] While North Dakota became a state in 1889, *Barnes* addresses events occurring in the Dakota Territory in 1887, with the underlying litigation having commenced in 1888. The delegation of congressional power to legislate for the District of Columbia has been analogized, by the Supreme Court, to the delegation of congressional power to legislate for other territorial possessions of the United States. *See, e.g.*, *John R. Thompson*, 346 U.S. at 106-07 ("The power of Congress to grant self-government to the District of Columbia under Art. I, § 8, cl. 17 of the Constitution would seem to be as great as its authority to do so in the case of territories.").

10

Fittingly, the District of Columbia Circuit's ruling in *Marijuana Policy Project* supports this reasoning. There, citizens gathered sufficient signatures to permit a ballot referendum on allowing certain medical patients to utilize marijuana "for the alleviation of their symptoms." *Marijuana Policy Project*, 304 F.3d at 84. Yet a then-extant rider on appropriations to the District of Columbia forbade the use of appropriated funds "to enact or carry out any law, rule, or regulation to legalize or otherwise reduce penalties associated with the possession, use, or distribution of any schedule I substance under the Controlled Substances Act . . . or any tetrahydrocannabinols derivative." *Id.* at 84 (quoting Pub. L. No. 107-96, § 127(a), 115 Stat. 923 (2001)).

The District of Columbia Circuit observed that, under the then-effective but since-abandoned "Barr Amendment," "only . . . Congress, not the D.C. Council, may reduce marijuana penalties." *Id.* at 84. And, finding the "Barr Amendment" to not be an unconstitutional violation of the First Amendment, the court concluded that Congress did have the ability, through strategic appropriations, to "withdraw the District's authority to reduce marijuana penalties." *Id*. at 85.

Inherent in finding Congress could, through appropriation, "withdraw the District's authority" to legislate in contravention of the Controlled Substances Act necessarily implies, in turn, that the District of Columbia has such an authority in the first instance. One cannot much "withdraw" authority that does not exist. Yet, equally importantly, such a holding would not have been necessary—or even rational—if proposed legislation allowing the utilization of medical marijuana were in conflict with the Controlled Substances Act. The District of Columbia Circuit would not have had reason to reach an arcane First Amendment question if the proposed ballot initiative could be simply disregarded as a local government's effort to violate the Supremacy Clause and run roughshod over federal law. Rather, while never expressly stated, implicit in

11

*Marijuana Policy Project* is the notion that District of Columbia law—for one reason or another—*can* be at odds with the generic dictates of federal law. And, as set forth *passim*, that reason can be clearly found in Clause 17 of Section 8 of Article I of the United States Constitution.

There is an alternative, however, albeit one that is both legally and pragmatically jarring. If the District of Columbia's legislation permitting the licensed cultivation of medical marijuana is *not* to be regarded as a lawful delegation of Congressional authority, then the validity of the Home Rule Act itself (and all legislation promulgated thereunder) comes into question. The Supreme Court has been clear that the nondelegation doctrine bars Congress from delegating its constitutional legislative obligations, except "that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U. S. 394, 409 (1928))).

Mr. Barnette does not assert the Home Rule Act to be an unconstitutional violation of the nondelegation doctrine. Rather, as set forth *supra*, he urges the delegation to be a lawful conferral of the Congressional power on the local government of the District of Columbia, with the local government exercising the Congressional power when enacting legislation that is neither vetoed nor repealed by Congress. However, to the extent the U.S. Trustee maintains that the District of Columbia is doing something less than exercising Congressional authority when legislating, such would seem to necessarily call into question the legitimacy of the Home Rule Act. There is no other modern statutory scheme that permits the District of Columbia to legislate for itself; after all, the legislative power over the nation's capital is exclusively vested in Congress in Article I of the Constitution. So if the U.S. Trustee asserts the medical marijuana laws to be at odds with federal

12

law—and not, as in *WPG*, an understood District of Columbia-centric exception to the generality

of federal law—it would seem the U.S. Trustee is suggesting the legislation is rooted in something

other than a lawful delegation of Congress' powers.

Set forth below are arguments that (i) the Controlled Substances Act is no longer binding

federal legislation on the topic of marijuana in states with local licensing schemes; and (ii)

bankruptcy courts sitting in such states should permit the reorganization of marijuana-centric

businesses. However, axiomatically, "federal courts have no license to provide advisory opinions

on issues that are not presented by the case before them," and "[c]ourts must choose the narrowest

constitutional path to decision." *Qassim v. Trump*, 927 F.3d 522, 529 (D.C. Cir. 2019) (citing *Flast*

*v. Cohen*, 392 U.S. 83, 96 (1968); *Public Serv. Elec. & Gas Co. v. FERC*, 783 F.3d 1270, 1274

(D.C. Cir. 2015); *Ass'n of Am. R.Rs. v. United States DOT*, 896 F.3d 539, 544 (D.C. Cir. 2018);

*Golden v. Zwickler*, 394 U.S. 103, 108 (1969); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217

(1995); *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J.,

concurring)). *But see Kiviti v. Bhatt*, 80 F.4th 520 (4th Cir. 2023) (holding bankruptcy courts are

not constrained by Article III limitations). Here, the narrowest path to resolution of the Motion is

one centered on the peculiarities of District of Columbia law, not one that speaks to the palpably

broader concerns of the nationwide applicability of the Controlled Substances Act or the

nationwide utilization of the Bankruptcy Code. And it is thusly urged that the Motion be denied

on this narrow basis.

IV.     **Argument: Department of Justice Policy and Precedent Precludes Consideration
of the Portions of the Controlled Substance Act Otherwise Applicable to the
Licensed Cultivation of Marijuana in Jurisdictions with Local Regulatory
Schemes Permitting Licensed Cannabis Cultivation**

For the majority of the preceding twelve years, the United States Department of Justice—

of which the Office of the United States Trustee is, quite notably, a part—has openly advanced a

policy of not enforcing the Controlled Substances Act restrictions on marijuana in jurisdictions that regulate the cultivation and sale of marijuana. From Maine to Oregon, licensed cannabis dispensaries have taken to littering public roadways, openly advertising the sale of marijuana to adult members of the public. Consistent with federal policy, these dispensaries—open and notorious purveyors of marijuana, advertising their trade in plain view of federal and state law enforcement authorities—have operated without being bombarded by agents donning FBI windbreakers. Over these eleven years, whether passively or actively, the Controlled Substances Act has *de facto* atrophied in connection with the regulated sale of marijuana in jurisdictions where local law permits such.

In 1961, the Supreme Court was confronted with two declaratory judgment actions concerning a State of Connecticut penal statute prohibiting the giving of medical advice on the use of contraceptives. The high court declined to pass judgment on the constitutionality of the at-issue statute because there was no evidence of the prohibition actually being enforced:

> It is clear that the mere existence of a state penal statute would constitute insufficient grounds to support a federal court's adjudication of its constitutionality in proceedings brought against the State's prosecuting officials if real threat of enforcement is wanting. If the prosecutor expressly agrees not to prosecute, a suit against him for declaratory and injunctive relief is not such an adversary case as will be reviewed here. Eighty years of Connecticut history demonstrate a similar, albeit tacit agreement. The fact that Connecticut has not chosen to press the enforcement of this statute deprives these controversies of the immediacy which is an indispensable condition of constitutional adjudication. This Court cannot be umpire to debates concerning harmless, empty shadows. To find it necessary to pass on these statutes now, in order to protect appellants from the hazards of prosecution, would be to close our eyes to reality.

*Poe v. Ullman*, 367 U.S. 497, 507-08 (1961) (citing *Ex parte La Prade*, 289 U.S. 444, 458 (1933);

*C. I. O.  v. McAdory*, 325 U.S. 472, 475 (1945)).[6]

---

[6] The Supreme Court would, of course, again address the State of Connecticut's contraception laws four years later, in *Griswold v. Connecticut*, 381 U.S. 479 (1965). *Griswold*, however, concerned the actual use of contraceptives and the making of an actual arrest. *Griswold*, 381 U.S. at 480.

14

The District of Columbia Circuit concluded similarly, some eight years later, when considering a litigant's efforts to invoke an unused regulation in a negligence per se suit stemming from the death of a hospital patient:

> If the Department of Public Health regards the regulation as outmoded, and has not considered its provisions in licensing hospitals, the proper conclusion is that the regulation is not applicable to this case. The hospital could encounter the regulation only in the licensing process; if the Department of Public Health has ignored its requirements, the hospital has not come under the regulation's sway, and consequently the question of its violation cannot arise.

*Lucy Webb Hayes Nat'l Training Sch. etc. v. Perotti*, 419 F.2d 704, 713 (D.C. Cir. 1969).

There is scant federal case law on the applicability, *vel non*, of the doctrine of desuetude. One federal court has observed that "if the defense of desuetude even exists, it is reserved for extreme cases." *United States v. Jones*, 347 F. Supp. 2d 626, 629 (E.D. Wis. 2004) (citing *Cent. Bank of Mattoon v. United States Dep't. of Treasury*, 912 F.2d 897, 906 (7th Cir. 1990)). Yet the licensed sale of marijuana, across a broad spectrum of states, for a protracted period of time, would seem an "extreme case" if ever there was one. And, to the extent desuetude may be invoked in connection with federal law, a 2003 case from West Virginia's high court offers analysis of the elements underlying modern application of the Scottish doctrine:

> Penal statutes may become void under the doctrine of desuetude if:
>
> (1) The statute proscribes only acts that are *malum prohibitum* and not *malum in se*;
>
> (2) There has been open, notorious and pervasive violation of the statute for a long period; and
>
> (3) There has been a conspicuous policy of nonenforcement of the statute.

*State ex rel. Canterbury v. Blake*, 584 S.E.2d 512, 516 (W. Va. 2003) (quoting *Legal Ethics v. Printz*, 416 S.E.2d 720 (W. Va. 1992)).

Circa 2025, it appears difficult to contend the cultivation of medical marijuana is *malum in se*. Eighty-nine years have elapsed since the release of *Reefer Madness*, with the film being today more widely regarded as an inadvertent parody than an actual cautionary exercise told through the medium of cinematic horror. As noted *supra*, marijuana dispensaries abound in numerous major American cities. And, perhaps most tellingly, when the representative councilmembers of the District of Columbia elected to legalize medical marijuana, the United States Congress did not find moral outrage sufficient to veto the legislation.

Similarly, violations of the Controlled Substances Act—as the law relates to the licensed cultivation of marijuana in jurisdictions with a correlative regulator scheme—have been assuredly open, notorious, and pervasive for a now-extended period of time. There are no less than nine medical marijuana dispensaries open for business in the District of Columbia, with two more due to soon come online. *See* Medical Cannabis Retailer Locations, https://abca.dc.gov/page/medical-cannabis-retailer-locations#gsc.tab=0 (last visited July 20, 2024). Anecdotally, the streets of Chinatown reek of marijuana. And a website called "Weed Maps" has become a prominent go-to source for those looking to procure cannabis through either a storefront shopping experience or a home delivery service. *See* Weed Maps, https://weedmaps.com/ (last visited July 21, 2024). It is difficult to credibly argue regulated marijuana use is not now a part of the fabric of myriad American states and cities.

And there has, too, been a conspicuous policy of non-enforcement of this provision of the Controlled Substances Act. On August 29, 2013, a memorandum was distributed to all United States Attorneys (meaning all persons holding the official position of "United States Attorney"— not all persons licensed to practice law in the United States), from then-Deputy Attorney General James M. Cole, instructing, *inter alia*:

> In jurisdictions that have enacted laws legalizing marijuana in some form and that
> have also implemented strong and effective regulatory and enforcement systems to
> control the cultivation, distribution, sale, and possession of marijuana, conduct in
> compliance with those laws and regulations is less likely to threaten the federal
> priorities set forth above. Indeed, a robust system may affirmatively address those
> priorities by, for example, implementing effective measures to prevent diversion of
> marijuana outside of the regulated system and to other states, prohibiting access to
> marijuana by minors, and replacing an illicit marijuana trade that funds criminal
> enterprises with a tightly regulated market in which revenues are tracked and
> accounted for. In those circumstances, consistent with the traditional allocation of
> federal-state efforts in this area, enforcement of state law by state and local law
> enforcement and regulatory bodies should remain the primary means of addressing
> marijuana-related activity. If state enforcement efforts are not sufficiently robust to
> protect against the harms set forth above, the federal government may seek to
> challenge the regulatory structure itself in addition to continuing to bring individual
> enforcement actions, including criminal prosecutions, focused on those harms.

James M. Cole, *Memorandum for All United States Attorneys* (Aug. 29, 2013) (the "Cole

Memorandum).

In fact, the Cole Memorandum has been expressly relied upon by the United States District

Court for the District of Columbia, in confronting litigation commenced by "a prospective

participant in the District of Columbia's nascent medical marijuana program." *Sibley v. Obama*,

819 F. Supp. 2d 45, 47 (D.D.C. 2011). Finding the plaintiff therein to lack standing to seek an

injunction prohibiting application of the Controlled Substances Act, the district court—of which

this Honorable Court is a statutory "unit," 28 U.S.C. § 151—held, *inter alia*:

> Plaintiff has not supported his claim of feared prosecution with alleged facts
> suggesting he is credibly threatened with immediate prosecution. Indeed, plaintiff's
> assertion that he has the threat of criminal prosecution "hanging over his head"
> rings of speculation and is not specific to him. Likewise, regardless of how one
> characterizes the Cole Memorandum, it contains no language indicating a specific
> threat or high probability of enforcement against plaintiff in particular.

*Sibley*, 819 F. Supp. 2d at 50 (citing *Seegars v. Ashcroft*, 396 F.3d 1248, 1255 (D.C. Cir. 2005);

*Navegar, Inc. v. United States*, 103 F.3d 994, 1001 (D.C. Cir. 1997)).

When the former Attorney General came before the United States Senate for confirmation

hearings in 2021, he noted, *inter alia*, "[i]t does not seem to me a useful use of limited resources

17

that we have, to be pursuing prosecutions in states that have legalized and that are regulating the use of marijuana, either medically or otherwise. I don't think that's a useful use." *Attorney general nominee Garland signals friendlier marijuana stance*, MSBizDaily, Feb. 22, 2021, at https://mjbizdaily.com/attorney-general-nominee-merrick-garland-signals-friendlier-marijuana-stance/ (last visited July 20, 2024). Similarly, ". . . William Barr testified during his Senate confirmation hearing that he would deprioritize marijuana prosecutions in states that had legalized cannabis use." *Jensen v. Md. Cannabis Admin.*, 2024 U.S. Dist. LEXIS 33001, at *29 n.13 (D. Md. Feb. 27, 2024) (citing *Confirmation Hearing on the Nomination of Hon. William Pelham Barr to be Attorney General of the United States Before the S. Comm on the Judiciary*, 116th Cong. 65 (2019)).

And, perhaps more pointedly, the United States Congress has actually prohibited the Department of Justice from expending appropriated funds to stop the regulation of marijuana on a state level. Pub. L. No. 114-113 § 542; 129 Stat. 2242 § 542. Two separate courts of appeal, in reviewing this appropriation restriction, have gone so far as to hold that any efforts of the Department of Justice, to interfere with marijuana-centric activities that strictly adhere to the dictates of state law, are a violation of the Appropriations Clause. *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016); *United States v. Bilodeau*, 24 F.4th 705 (1st Cir. 2022). *See also* U.S. Const. art. 1, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.").

In fact, this case may well be the first time the United States Department of Justice has advocated for judicial enforcement of the Controlled Substances Act's marijuana-centric provisions, in connection with the regulated cultivation of cannabis in the District of Columbia,

since prior to the issuance of the Cole Memorandum. And that such enforcement effort comes in

the veritably non-criminal context of a bankruptcy proceeding, and not through an indictment

returned to a magistrate judge of the district court—or even the municipal court—is telling. The

Controlled Substances Act has long-since ceased being enforced in connection with the licensed

cultivation of marijuana in jurisdictions with local regulatory schemes providing for such

licensure.

Thusly, whether through recognition of the doctrine of desuetude or mere adherence to the

Supreme Court's holding in *Poe*, it is clear that the alleged criminal violation underlying the

Motion is one that has atrophied with the passage of time and the evolution of social standards.

Contraceptives are now sold in nearly every supermarket and pharmacy in America; gambling—

not long ago confined to the desert of Nevada, the riverboats of Mississippi, and a thin stretch of

New Jersey boardwalk—is now a taxed, app-based pastime in 38 states and the District of

Columbia; and federal marijuana laws are openly ignored in at least 20 states and the District of

Columbia. Feigning to the contrary, and suggesting an extant regime where the topical provisions

of the Controlled Substances Act ought to be regarded as the binding penal mandate of the United

States, is simply not a posture consistent with the most plain of realities.

### V.    Argument: Bankruptcy Courts are not Precluded from Administering Marijuana-Centric Cases in Jurisdictions where Federal Anti-Marijuana Laws are Not Enforced

While believed to be the first such occurrence in the District of Columbia, this is not the

first instance of a bankruptcy court being asked to confront the plight of a debtor working in the

licensed marijuana industry. And in the hodgepodge of admittedly oft-conflicting rulings to have

emerged from these cases may be found support for the proposition that even if marijuana is

expressly criminalized under the Controlled Substances Act, bankruptcy courts may still

administer cannabis-centric cases. Tellingly, the recent trend of such cases is in favor of allowing such administration to occur.

Just last year, the United States Bankruptcy Court for the Northern District of California saw fit to deny two motions to dismiss a Chapter 7 case (with one such motion being filed by the U.S. Trustee) because, *inter alia*, "administering the ownership interests of LLCs that engage in marijuana business is not necessarily equivalent to administering marijuana assets." *In re Callaway*, 2024 Bankr. LEXIS 1515, at *2 (Bankr. N.D. Cal. June 26, 2024).

In *Callaway*, the debtor owned and operated 100% of one cannabis dispensary, owned 40% of another cannabis dispensary, and owned interests in other businesses, "some operating, some no longer operating, some never operated, some, but not all, related to cannabis." *Id.* at *4.

The *Callaway* Court observed that while the Controlled Substances Act does prohibit myriad actions, "[n]one of these prohibitions, or others in the CSA, even when directed to be read as broadly as possible, include a direct prohibition on owning or disposing of an interest in an entity that engages in marijuana business." *Id.* at *7 (citing 21 U.S.C. § 854(d)). Equally:

> As it relates to marijuana, the Justice Department has for years taken both an implicit and explicit hands-off approach to enforcement of the CSA as it relates to state-regulated manufacture and distribution. This hands-off approach has been in place in various iterations since 2013, and marijuana businesses that adhere to state and local laws permitting such business have grown. **In 2024, it seems the only arm of the executive branch with an explicit mission to enforce the CSA against state-regulated marijuana businesses is the UST Program in seeking to dismiss bankruptcies on the basis of a trustee or estate's potential administration of assets in violation of the CSA.**

*Id.* at *8 (emphasis added).

To be sure, *Callaway* relies, in large part, on means of monetizing a debtor's estate without engaging in the actual sale of marijuana, such as through "sales of interests in LLCs, enforcement of LLCs' contractual rights and sale of other intangibles related to marijuana, but not directly implicated by the language of the CSA." *Id.* at *18. Yet such a regime is not far removed from

20

what has been proposed *sub judice*: Mr. Barnette has filed a plan of reorganization through which the overwhelming majority of monies paid to creditors will be realized through the liquidation of litigation rights. *See* Plan of Reorganization (the "Plan"), DE #26. Yes, the Plan does offer additional monies to creditors through the making of monthly payments of $500.00, for 36 months, but those funds amount to a scant $18,000.00, juxtaposed to the litigation rights that are designed to set off a liability of more than $1 million. *Id*. at p. 1.

If Mr. Barnette needs to amend his Plan, so as to ensure none of the monthly payments stem from the cultivation and sale of marijuana, he can do so (and, to be sure, Mr. Barnette is bound to amend the Plan in any event, to conform to certain idiosyncrasies of Subchapter V). But such an issue is also premature; the question, raised by the Motion, is whether a person engaged in the marijuana industry *can* be a debtor in the first instance—not whether the Plan *sub judice* can be lawfully confirmed. All Mr. Barnette suggests instantly is that he is entitled to seek bankruptcy protection and to reorganize; if certain eccentricities will, in turn, govern *how* that reorganization is to occur, such will be addressed in due course. Mr. Barnette could explore taking monthly loans, from non-marijuana sources, to make his plan payments with funds unrelated to the cannabis trade; he could sell limited participation rights, in distributions to be given by his cannabis company, to a third party, so as to realize monies of an equivalent nature that are not the direct byproduct of cannabis sales; he could even use his plan as the foundation of a swap agreement with a third party, exchanging marijuana-based income for non-marijuana-based income, and using the proceeds to fund plan payments. All of that can—and will—be addressed in due course, through the confirmation process. For present purposes, the only question is if Mr. Barnette may proceed at all.

21

Moreover, *Callaway* is not an outlier. While myriad cases certainly do support the dismissal of marijuana-centric bankruptcy petitions, numerous cases also hold otherwise. As observed by the Bankruptcy Appellate Panel of the First Circuit, just last year:

> Broad categorical parameters regarding who is eligible to be a debtor are not the stuff of good faith, a fact-intensive inquiry specific to individual debtors and their particular financial circumstances. As far as eligibility goes, Congress has not articulated a "'zero-tolerance' policy that requires dismissal of any bankruptcy case involving violation of the CSA (or other activity that might be proven to be illegal)." That type of policy choice to close the doors to the bankruptcy court categorically, without regard to individual circumstances, is one more appropriately left to the legislature.

*Blumsack v. Harrington*, 657 B.R. 505, 515 (B.A.P. 1st Cir. 2024) (quoting *In re Hacienda Co.*, 647 B.R. 748, 754 (Bankr. C.D. Cal. 2023)).

*Blumsack* was a Chapter 13 case, commenced by an individual who "worked at a cannabis dispensary in the Commonwealth of Massachusetts" and who "proposed a plan that would have been funded with earnings from his employment at the dispensary." *Id.* at 509. The U.S. Trustee both objected to the debtor's plan and moved to dismiss the case, with the bankruptcy court sustaining the objection and granting the motion. While the *Blumsack* Court did affirm the dismissal of the debtor's case, with emphasis on concerns about a Chapter 13 trustee handling tainted monies, the court also broadly cautioned that:

> . . . in general, it is outside the scope of duties incumbent upon bankruptcy judges under the Constitution and laws of the United States to prosecute, adjudicate, and punish violations of federal criminal law. Those responsibilities are, instead, within the province of the executive branch and the United States District Courts in the management of their criminal dockets. In the nonbankruptcy context, there exists an entire toolkit to address violations of federal criminal laws like the CSA. If Congress had assigned a bankruptcy-specific remedy for violations of the CSA, then the bankruptcy courts would be duty bound to follow that directive. In the absence of such direction, the blunt remedy of dismissal was not warranted under § 105 and the oaths.

*Blumsack*, 657 B.R. at 515-16 (citing *Hacienda Co.*, 647 B.R. at 754).

The *Blumsack* Court's reliance on *Hacienda Co.* is well-placed, too. There, the United

States Bankruptcy Court for the Central District of California observed, in the prism of a Chapter

11 case:

> Congress did not adopt a "zero tolerance" policy that requires dismissal of any bankruptcy case involving violation of the CSA (or other activity that might be proven to be illegal).
>
> True, Congress has enacted the CSA and this Bankruptcy Court's duty is to follow Congressional directives. On the other hand, Congress has not specified what should be the bankruptcy-specific remedy for any violation of the CSA.
>
> Congress could have included within the examples of "cause" in § 1112(b)(4) a violation of the CSA, or any other nonbankruptcy laws, but it chose not to do so. This implies that violations of nonbankruptcy laws do not necessarily constitute cause for dismissal or conversion.

*Hacienda Co.*, 647 B.R. at 754 (citing *Burton v. Maney (In re Burton)*, 610 B.R. 633, 637 (B.A.P.

9th Cir. 2020)).

The *Hacienda Co.* analysis of "cause" under Section 1112(b)(4) is instructive. As observed

by that court, Section 1112 does not enumerate "a violation of the CSA, or any other

nonbankruptcy laws," *Hacienda Co.*, 647 B.R. at 754, as constituting "cause." True, the provisions

are expressly non-exhaustive but, as noted by the foregoing authorities, it would seem that if

Congress intended a violation of non-bankruptcy law to, *ipso facto*, constitute "cause," Congress

would have included such on the delineated lists of "cause."

Mr. Barnette does not assert that a violation of the Controlled Substances Act categorically

cannot ever constitute cause. Assuredly, if an individual engaged in the ongoing trafficking of

heroin were to seek bankruptcy protection, myriad equitable concerns would almost assuredly

constitute "cause" for dismissal. But in such an instance, it is also difficult to envision the meeting

of creditors could be so much as called—much less concluded—without the debtor being taken

into federal custody.

23

Rather, what Mr. Barnette asserts is that "cause" premised upon putatively forbade conduct is a fact-intensive analysis to be considered under this Honorable Court's equitable powers, recognizing that not all penal violations are to be regarded equally. Assuredly a debtor who habitually jaywalks whilst taking work calls, or who shows an ongoing propensity to disregard posted speed limits when delivering goods as a courier, is entitled to reorganize in bankruptcy. And lest those examples seem hyperbolic in nature, the local laws forbidding jaywalking in the District of Columbia, and the federal laws prohibiting speeding on the Baltimore-Washington Parkway, share a commonality unknown to the Controlled Substances Act prohibition of municipally-licensed marijuana growth: the jaywalking and speeding laws are actually still enforced.

## VI.    Argument: Mr. Barnette Has Not Grossly Mismanaged His Estate

The U.S. Trustee next contends Mr. Barnette has grossly mismanaged his estate by failing to fully account for monies formerly titled in the name of a decedent's estate, utilized to make rental payments for the benefit of District Growers. In so doing, however, the U.S. Trustee overlooks a significant reality: neither Mr. Barnette's deceased relative, nor District Growers, are debtors in bankruptcy. And there is thusly no discernable nexus between the expenditure of these monies and the administration of Mr. Barnette's estate.

Under District of Columbia law, "[a] limited liability company is an entity distinct from its member or members." D.C. Code § 29-801.04(a). *See also Martin v. Santorini Capital, LLC*, 236 A.3d 386, 394 (D.C. 2020) (". . . an LLC, like a traditional corporation, 'is an entity distinct from its member or members.'") (quoting D.C. Code § 29-801.04(a)).

While the Bankruptcy Code does provide for "gross mismanagement of the estate" to constitute "cause" for dismissal or conversion, 11 U.S.C. § 1112(b)(4)(B), the word "estate" is

assuredly a reference to a given debtor's *bankruptcy* estate. Indeed, the Bankruptcy Code provides, exhaustively, what shall constitute a debtor's estate, 11 U.S.C. § 541, and neither a business partially owned or operated by a debtor are encompassed therein (even if the membership interest itself is), nor is the bank account of a deceased relative, *id.*

To be sure, it is not merely that the U.S. Trustee is endeavoring to conflate Mr. Barnette and District Growers by asserting that a failure to account for monies utilized by District Growers constitutes mismanagement of Mr. Barnette's estate. It is, too, that the U.S. Trustee is seemingly doing so with a cognizance that Mr. Barnette's actual bankruptcy estate is both discreet in scope and perfectly well managed. If this were not a marijuana-centric case, the probabilities of this argument being advanced would assuredly be *de minimis* in nature. Yet because the U.S. Trustee, as discussed *passim*, appears to be the last bastion of the federal government intent on enforcing marijuana laws in licensed and regulated jurisdictions, the U.S. Trustee seems intent to fish for any conceivable basis upon which to readily dispatch with this case.

Yet even if, *arguendo*, the decedent's bank account (which Mr. Barnette is no longer using to facilitate the operations of District Growers) were to be examined, the withdrawal of cash therefrom ought not invite claims of "mismanagement." At the core of this case is the underlying question of whether or not a debtor with ties to the licensed marijuana trade may reorganize in bankruptcy; if that question is to be answered in the affirmative, the myriad banking irregularities—and resultant cash-dependent virtues of the industry—necessitate recognition. Plainly, a decedent's bank account was used—formerly and not presently—to aid in the banking of a marijuana business because of the palpable difficulties occasioned by such businesses in seeking traditional depository relationships.

## VII.    Argument: Insurance and Reporting Issues Do Not Weigh in Favor of Dismissal

The U.S. Trustee also posits that a putative failure of the Debtor, to account for policies of insurance, "constitutes gross mismanagement of the estate." Motion, DE #66, at § D, p. 11. This is a strange argument, insofar as a failure to furnish information would ordinarily invite a motion premised upon "failure timely to provide information or attend meetings reasonably requested by the United States trustee." 11 U.S.C. § 1112(b)(4)(H). Yet, critically, such a motion—if brought— would be one that can be readily mooted through the provision of information at or before a hearing, *In re Franmar, Inc.*, 361 B.R. 170, 179 (Bankr. D. Colo. 2006). And the U.S. Trustee, perhaps cognizant of such, has thusly endeavored to reframe this minor grievance as an act of mismanagement for which a cure is not available.

To be sure, if the Debtor possesses an insurance policy (something that remains unclear— the subject asset may well belong to a non-filing spouse), schedules in this case will be seasonably amended. And if any loans were taken against such policy, it appears the lending activity occurred prior to this case's conversion to Chapter 11 and, as such, prior to the reach of Section 1112 touching this case.[7] Moreover, to the extent any loans were taken out against an asset of the Debtor (something that is, very genuinely, unclear), such can no doubt be thoroughly addressed in an amended Plan, ensuring no detriment is occasioned by any creditors.

The U.S. Trustee has also pointed to the Debtor's failure to timely file an operating report for October 2024. This error has now been cured, DE #69, with a November report also being docketed, DE #70. The Debtor is actively working on a report for December 2024 and appreciates the need to file such items in a prompter and more compliant fashion on a go-forward basis.

---

[7] Mr. Barnette was formerly a debtor in Chapter 12 which, rather importantly, utilizes far more limiting language in contemplating mismanagement-centric dismissals. 11 U.S.C. § 1208(c)(1).

## VIII.    Conclusion

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) deny the Motion; and (ii) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: January 22, 2025          By:    /s/ Maurice B. VerStandig
                                        Maurice B. VerStandig, Esq.
                                        Bar No. MD18071
                                        The Belmont Firm
                                        1050 Connecticut Avenue, NW
                                        Suite 500
                                        Washington, DC 20036
                                        Phone: (202) 991-1101
                                        mac@dcbankruptcy.com
                                        *Counsel for the Debtor*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of January, 2025, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig

27